# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 7, 2008      Decided December 30, 2008

No. 07-1175

LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARKANSAS PUBLIC SERVICE COMMISSION, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Michael R. Fontham* argued the cause for petitioner. With him on the briefs were *Paul L. Zimmering*, and *Noel J. Darce*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*J. Wayne Anderson* argued the cause for intervenors. On the brief were *Mary Woodford Cochran*, *Paul Randolph Hightower*, *Ted Joseph Thomas*, *Clinton A. Vince*, *Orlando E. Vidal*, *William S. Scherman*, and *Gregory W. Camet*. *Emma F. Hand* entered an appearance.

Before: ROGERS, TATEL, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Over the Louisiana Public Service Commission's objection, the Federal Energy Regulatory Commission approved a new long-term allocation of power-generating capacity among the affiliates of the Entergy system. In so doing, FERC interpreted the provision of the Entergy System Agreement that governs off-system sales as inapplicable to short-term opportunity sales. Aggrieved by FERC's decision approving the long-term, intra-system allocations and upset at FERC's interpretation regarding the short-term, off-system sales, the Louisiana Commission petitions for review on both issues. Yet the only issue before us on which FERC actually took action was the approval of Entergy's long-term allocations, making that the only issue we have jurisdiction to decide. Finding it easily resolved by our standard of review, we deny the petition.

**I.**

Because we have dealt many times with the Entergy system and its predecessors, most recently in *Louisiana Public Service Commission v. FERC* ("*Louisiana 2008*"), 522 F.3d 378 (D.C. Cir. 2008), we describe it here only briefly. Entergy is a multi-state affiliation of power companies that share the costs and benefits of power generation. At all times relevant to this appeal, it consisted of five affiliates: Entergy

Louisiana, Entergy Gulf States, Entergy New Orleans, Entergy Mississippi, and Entergy Arkansas. The affiliation is governed by the Entergy System Agreement, and although that agreement creates an integrated system, it allots to each affiliate the primary responsibility for and benefit from the generation facilities in the affiliate's jurisdiction. Because these facilities run on different fuels, shifts in the relative price of coal, gas, and nuclear energy can create striking cost disparities among the affiliates. To balance such disparities, we have long viewed the System Agreement as requiring that affiliates share the costs of power generation in roughly equal proportion. *See, e.g.*, *Miss. Indus. v. FERC*, 808 F.2d 1525, 1554–55 (D.C. Cir. 1987). The Entergy System has accomplished this rough equalization primarily through careful allocation of new generation capacity. As an "insurance policy" should long-term allocation plans fail to achieve proper cost-spreading, however, FERC recently adopted a "bandwidth remedy" that limits any relative cost discrepancies plus or minus 11 percent. *Entergy Servs., Inc.*, 111 F.E.R.C. ¶ 61,311, at 62,356 (2005). We approved that remedy in *Louisiana 2008*, 522 F.3d at 391.

Facing a complaint from New Orleans, which was bearing unusually high production costs, Entergy submitted to FERC a proposed reallocation of generating capacity. *See Entergy Servs., Inc.* ("*Opinion No. 485*"), 116 F.E.R.C. ¶ 61,296, at 62,485 (2006). Under the proposed allocations, Entergy Arkansas and Entergy Gulf States would "sell" their cheaper generation capacity to Entergy New Orleans and Entergy Louisiana, *id.* at 62,486 & nn.14–15, thereby allowing New Orleans to pass costs from its more expensive generators on to the now-undersupplied Entergy Gulf States. These paper transfers of power would lower costs for New Orleans and Louisiana but raise costs for Gulf States. Representing Gulf States's customers, the Louisiana

Commission thus opposed the allocations as discriminatory. The same administrative law judge who presided over the extensive bandwidth proceedings approved the allocations, *Entergy Servs., Inc.* ("*Initial Decision*"), 111 F.E.R.C. ¶ 63,077 (2005), and FERC affirmed that decision in relevant part, both on exceptions from the initial decision, *Opinion No. 485*, 116 F.E.R.C. ¶ 61,296, and on petition for rehearing, *Entergy Servs. Inc.* ("*Opinion No. 485-A*"), 119 F.E.R.C. ¶ 61,019 (2007).

In the course of these proceedings, the Louisiana Commission discovered that Entergy Arkansas had been selling cheap energy off system through a series of month-long opportunity transactions without offering the other Entergy affiliates first bite at those electrons. The Louisiana Commission believed this a violation of section 3.05 of the System Agreement, which provides:

> It is the long term goal of the Companies that each Company have its proportionate share of Base Generating Units available to serve its customers either by ownership or purchase. Any Company which has generating capacity above its requirements, which desires to sell all or any portion of such excess generating capacity and associated energy, shall offer the right of first refusal for this capacity and associated energy to the other Companies under Service Schedule MSS-4 Unit Power Purchase.

Entergy System Agreement § 3.05 (2000). Although for several reasons the ALJ thought that the short-term, off-system sales were irrelevant to the long-term, intra-system allocation issue before him, he also doubted whether it would be sensible to apply this section of the System Agreement to

short-term opportunity sales at all. *Initial Decision*, 111 F.E.R.C. at 65,429–30. On exceptions, FERC agreed that any possible section 3.05 violation had nothing to do with the long-term allocation issue. But echoing the ALJ's doubts, FERC also said that "section 3.05 was not triggered by the one-month capacity sales." *Opinion No. 485*, 116 F.E.R.C. at 62,505. Believing that FERC had authorized the repeated sale of cheap energy off system, the Louisiana Commission pressed this issue on rehearing. There, FERC reaffirmed its view that any short-term sale violation had no import for the long-term allocation question actually before it, *Opinion No. 485-A*, 119 F.E.R.C. at 61,062–63, but this time it went on to explain in detail why section 3.05 of the System Agreement just shouldn't apply to short-term sales, *id*.

Before us the Louisiana Commission gives this apparently ancillary short-term sale dispute pride of place, arguing it first and resisting any attempt to connect it to the long-term allocation issue on which Entergy initiated these FERC proceedings. As the Louisiana Commission sees it, "[t]he short term sale issue has substance independent of the resource allocation" because "FERC's unnecessary holding on the point authorizes Entergy to sell cheap System resources" in a way that causes the Louisiana Commission's constituents independent harm. Appellant's Reply Br. 2. Because we have no doubt that FERC resolved the long-term allocation issue, we consider it first, turning second to the question of whether we should consider the short-term sale issue at all.

## II.

Conceding that "minimizing differences in production costs is a valid goal of resource allocations among operating companies," Appellant's Reply Br. 12, the Louisiana Commission challenges the long-term allocations approved by

FERC as ill-designed to serve that end. It argues that these allocations merely inverted the positions of Entergy New Orleans and Entergy Gulf States, driving the former's costs down by transferring them to the latter. It argues that FERC never studied the likely long-term effects of the allocation and that it unduly relied on the backstop provided by the bandwidth remedy. Ultimately, it says, the proof is in the production costs: following the allocations Entergy New Orleans went from about 12 percent above system average to about 1 percent below, whereas Entergy Gulf States went from about the average cost to about 8 percent above the system average.

We review FERC's treatment of this issue with great deference. We affirm its orders unless arbitrary or capricious, *Louisiana 2008*, 522 F.3d at 391, and treat its factual findings as conclusive if supported by substantial evidence, 16 U.S.C. § 825*l*(b). Where the subject of our review is, as here, a predictive judgment by FERC about the effects of a proposed remedy for undue discrepancies among operating companies, our deference is at its zenith. *See Louisiana 2008*, 522 F.3d at 393 ("We owe FERC great deference in reviewing its selection of a remedy . . . ."); *Envtl. Action, Inc. v. FERC*, 939 F.2d 1057, 1064 (D.C. Cir. 1991) ("[I]t is within the scope of the agency's expertise to make such a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.").

Given this lenient standard of review, we find ourselves unconvinced by the Louisiana Commission's arguments for second-guessing FERC's judgment. Although the ALJ acknowledged an apparent transfer of costs between New Orleans and Gulf States, *Initial Decision*, 111 F.E.R.C. at 65,432, he found it impossible to attribute the rise in Gulf

States's costs to the transfer alone. Indeed, the ALJ pointed to considerable record evidence in finding the data "inconsistent with the cause and effect correlation argued by [the Louisiana Commission]." *Id*. at 65,434. Among that evidence was the fact that because of the size difference between the two entities a transfer of capacity creating a six percent fall in the costs for New Orleans would create only a one percent rise in Gulf States's costs, and vice versa. *Id.* at 65,432, 65,434. The ALJ concluded that the evidence pointed to other causes that might have been contributing to a disproportionate rise in costs for Gulf States, including steadily increasing prices for natural gas. *Id.* at 65,434. He went on to note that Gulf States was slated for its own long-term allocations in the future and reasonably suggested that, to the extent these later allocations failed to remedy cost discrepancies persisting after the allocations under review, the bandwidth remedy created in the prior proceeding ensured a minimum level of rough equalization. *Id*. The ALJ also rejected the Louisiana Commission's alternative proposal as failing to address "the most important goal of reducing the disparity in relative production costs among the Operating Companies." *Id.* at 65,433. Thus, in light of the uncertainty regarding the source of Gulf States's cost increases, the planned future allocations, and the backstop provided by the bandwidth remedy, the ALJ saw no reason "to order a further fine-tuning by reallocating long-term life-of-unit shares . . . to try perhaps to shift [Gulf States's] relative percentage down a percent or two." *Id.* at 65,434. FERC twice affirmed that judgment, *Opinion No. 485*, 116 F.E.R.C. at 62,504; *Opinion No. 485-A*, 119 F.E.R.C. at 61,063–64, and without cause to question its reasonableness or its basis in record evidence, we likewise affirm.

### III.

Although these proceedings began with Entergy's request for approval of its long-term capacity reallocation, the Louisiana Commission allocates the bulk of its briefing to challenging FERC's interpretation of the System Agreement's right of first refusal.  It seems the Louisiana Commission may have originally presented this argument as somehow relating to the long-term allocation issue, as the ALJ thought it necessary to expressly reject various reasons for connecting them.  *See Initial Decision*, 111 F.E.R.C. at 65,430.  But it's hard to tell.  The Louisiana Commission now completely rejects "[t]he efforts of FERC and Entergy to connect the issues on appeal," calling these efforts "nothing but a diversion," Appellant's Reply Br. 1, and urging us to review FERC's interpretation of the System Agreement on the short-term sales issue regardless of its disconnect from the long-term allocation dispute.  To be sure, the Louisiana Commission's argument regarding FERC's interpretation of section 3.05 was aired before the agency, and FERC has strongly signaled its view of how it will likely read that section in the future, *Opinion No. 485-A*, 119 F.E.R.C. at 61,062–63.  Yet because we think it quite clear that FERC made no final decision on any claim for relief on the basis of a section 3.05 violation, we still have nothing to review.

A party may invoke our jurisdiction only if "aggrieved by an order issued by the Commission," 16 U.S.C. § 825*l*(b), not to challenge agency dicta unrelated to the order actually entered in the particular case.  *See Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1520 (D.C. Cir. 1990) (denying review of FERC's gratuitous statement of law where only injury was possible deference to this remark in future proceedings).  Indeed, unless the party challenges an actual FERC order, that party lacks the requisite injury to support Article III standing.  As we said in *Sea-Land Service, Inc. v. Department of*

*Transportation*, 137 F.3d 640 (D.C. Cir. 1998), "mere precedential effect within an agency is not, alone, enough to create Article III standing, no matter how foreseeable the future litigation." *Id.* at 648. Thus, the Louisiana Commission cannot establish standing simply by claiming that FERC *apparently* authorized future off-system opportunity sales by construing the System Agreement's right of first refusal as failing to reach such sales in an unrelated proceeding. For us to have Article III jurisdiction, the Louisiana Commission must instead point to some relief that FERC either granted or failed to grant in a proceeding where such relief was actually at issue.

The Louisiana Commission has given us no reason to believe that we are reviewing such a proceeding here. Entergy initiated this FERC docket to secure approval of its long-term allocations. Neither the Hearing Order listing the matters before the ALJ nor FERC's summary of what it decided mentions the short-term sale issue. *Opinion No. 485*, 116 F.E.R.C. at 62,485. Counsel for the Louisiana Commission admitted at oral argument that at their inception FERC's proceedings concerned this issue not at all and that FERC had no need to pass upon it. Oral Arg. 3:06, 7:06. In response, FERC counsel freely conceded that FERC's statements on the short-term sale issue amounted to nothing more than non-binding dicta—to be accepted or rejected by FERC as appropriate in a future docket where such sales are properly in dispute. *Id*. at 12:20. Accordingly, we conclude that these statements are in fact dicta and do not preclude the Louisiana Commission from pressing this issue in a different proceeding. Under these circumstances, Article III of the Constitution allocates us no power of review. In this respect, then, the petition is dismissed; in all others, it is denied.

*So ordered.*